## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| David Heinz, <br><br>          Plaintiff, <br><br> v. <br><br> Carrington Mortgage Services, LLC <br><br>          Defendant. | Case No. 18-cv-1919 (SRN/DTS) <br><br><br> **MEMORANDUM OPINION** <br> **AND ORDER** |

Jonathan L. R. Drewes, Drewes Law, PLLC, 817 Fifth Ave. S, Ste. 400 Minneapolis, MN 55404, for Plaintiff.

Daniel J. Sathre, Houser & Allison, APC, 350 Highway 7, Ste. 216 Excelsior, MN 55331, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This case arises from a homeowner's action against a lender alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C § 1692 *et seq.* ("FDCPA"). As a result of certain of Defendant's communications and conduct, Plaintiff Andrew Heinz alleges he lost his home of nearly twenty years to foreclosure and suffered emotional distress. Defendant Carrington Mortgage Services, LLC ("Carrington") now moves for summary judgment. Mr. Heinz opposes the motion.

The Court is sympathetic to Mr. Heinz's plight. However, because there is no evidence that the challenged communications and conduct relate to the "collection of a debt", the law forbids holding Carrington liable for these statements and actions under the

FDCPA.  For the reasons set forth below, Defendant's motion is granted and Mr. Heinz's complaint is dismissed with prejudice.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    *History of the Loan, Note, and Mortgage*

The material facts surrounding the underlying loan, promissory note, and mortgage are not in dispute.  Mr. Heinz is the former fee owner of property located in Dakota County, Minnesota (the "Property").  (Compl. [Doc. No. 1-1] ("Compl.") ¶¶ 1-3; Ostermann Aff. [Doc. No. 22] ("Ostermann Aff.") Ex. A.)  While residing at the Property for nearly twenty years with his wife and daughter, Mr. Heinz also operated his home-based business Heartland Business Services, Inc. from the Property.  (Heinz Aff. [Doc. No. 30] ("Heinz Aff.") ¶¶ 1-2; Ostermann Aff. Ex. H at 48.)

On March 25, 2008, Mr. Heinz borrowed $ 247,344 dollars from lender Countrywide Bank, FSB (the "Loan").  (Ostermann Aff. Ex. A.)  The Loan was evidenced by a promissory note, secured by a mortgage (the "Mortgage").  (*Id.*)  The Mortgage, executed by Mr. Heinz and his wife, Sranya Heinz, identifies Countrywide Bank FSB as the lender, and Mortgage Electronic Registration Systems, Inc. ("MERS") as the mortgagee, acting "solely as a nominee for [Countrywide Bank FSB's] and [Countrywide Bank FSB's] successors and assigns." *(Id.*, Ex. A.)  The Mortgage expressly authorizes MERS to "foreclose and sell the Property." (*Id.*, Ex. A at 2.)

On or about June 9, 2016, the note and Mortgage were assigned from MERS, as nominee, to Bank of America, N.A. ("BANA").  (Sathre Aff. [Doc. No. 23] ("Sathre

Aff.") Ex. A.)  BANA serviced the Loan until a service transfer to Carrington effective July 11, 2017.  (Ostermann Aff. Ex. K.)

In 2010, Mr. Heinz allegedly fell behind on his mortgage payments.  (*See id*., Ex. B.)  Although Carrington alleges that Mr. Heinz could not make a single payment between February 2010 and March 2011, resulting in a delinquency of $22,740.73 dollars (Def.'s Summ. J. Br. [Doc. No. 26] ("Def.'s Summ. J. Br.") at 3), the record only suggests that a loan modification was granted in March 2011 curing Mr. Heinz's unidentified amount of default, and bringing him current on his payments.  (Ostermann Aff. ¶ 11; Ex. B.)  By the time Carrington took over servicing of Mr. Heinz's loan from BANA, however, it is undisputed the Loan was "in default" again.  (Compl. ¶ 11; Heinz Aff. ¶ 8.)

Although two loan modifications were granted to Mr. Heinz in 2011 and 2014, as described below, BANA ultimately recorded a notice of pendency and power of attorney to foreclose the Property.  (Sathre Aff. Ex. B.)  On June 16, 2017, Mr. Heinz was personally served with the Notice of Mortgage Foreclosure Sale, Notice of Homestead Designation, Help for Homeowners in Foreclosure Notice, Foreclosure: Advice Notice to Tenants Notice, and Notice of Redemption Rights sale notice (together, the "Sale Notice").  (Ostermann Aff. Ex. O; Compl. ¶ 21.)  The Sale Notice informed Mr. Heinz that the foreclosure sale of the Property was initially scheduled for August 1, 2017.  (*Id*.)

The Property was eventually sold on November 14, 2017, approximately four months after Carrington took over servicing the Loan.  As detailed further below, this foreclosure followed two loss mitigation applications Mr. Heinz submitted to Carrington.

### 2. Mr. Heinz's Loan Modification Applications with Prior Servicer BANA

Following Mr. Heinz's first default in 2010, it is undisputed that he applied for loss mitigation assistance with BANA to avoid foreclosure. (Ostermann Aff. Ex. B.) Mr. Heinz was granted a loan modification in 2011 which erased the default, brought Mr. Heinz current on his payments, and allowed him to remain on the Property. (*Id.*)

In 2013, Mr. Heinz again defaulted and applied for loss mitigation assistance. (*See* Osterman Aff. Exs. C-D.) On September 19, 2013, BANA wrote a letter to Mr. Heinz notifying him that his request was denied for his failure to provide the required documents to complete the loan assistance application. (Ostermann Aff. Ex. D at 30-31.) Mr. Heinz was ultimately able to obtain a second loan modification that cured his default, and brought him current on his loan payments. (Ostermann Aff. Ex. C.)

In 2016, Carrington alleges, without citing to the record, that Mr. Heinz again defaulted and applied for loss mitigation assistance. (Def.'s Summ. J. Br. at 4.) The record shows, however, that in September 2016, BANA initiated a foreclosure process against Mr. Heinz. (Sathre Aff. Ex. B.) On September 13, 2016, BANA recorded a notice of pendency and power of attorney to foreclose the Property. (Sathre Aff. Ex. B.) Pursuant to the Sale Notice, Mr. Heinz was informed that the foreclosure sale of the Property was initially scheduled for August 1, 2017.[1]

---

[1] On or about August 2, 2017, Mr. Heinz was notified by letter that the August 1 sale had been postponed to September 19, 2017. (Ostermann Aff. Ex. E at 32.) On the day of the rescheduled sale, Carrington notified Mr. Heinz that the sale date had been further postponed to November 14, 2017. (*Id.*, Ex. E at 34.)

On March 4, 2017, BANA wrote a letter to Mr. Heinz notifying him that his application was no longer being reviewed for his failure to provide the required documents to complete the loan assistance application.  (Ostermann Aff. Ex. D at 29.) Two months later, on May 18, 2017, BANA sent another letter to Mr. Heinz notifying him that his application was still incomplete and no longer under review for his failure to submit the requested documents in support of his application.  *(Id*. at 28.)

### 3.    *Mr. Heinz's Loss Mitigation Applications with Carrington*

As of July 11, 2017, Carrington began servicing Mr. Heinz's loan.  (Ostermann Aff. Ex. K.)  Shortly after receiving notice of this transfer, Mr. Heinz spoke to Carrington by telephone.  (Heinz Aff. ¶ 9.)  During the call, Mr. Heinz alleges that Carrington demanded that Mr. Heinz "produce to them a loss mitigation package by midnight that same evening in order to prevent a foreclosure sale of [Mr. Heinz's] property."  (Heinz Aff. ¶ 10.)  In response, Mr. Heinz alleges that he immediately sought assistance from the Minnesota Attorney General's Office "with the loss mitigation submissions and his dealings with Carrington."  (*See* Heinz Aff. ¶¶ 12-21.)  When Mr. Heinz made any submissions to Carrington, he alleges that he "commonly sent copies of the submissions to the Minnesota Attorney General's Office."  (*See* Heinz Aff. ¶ 18.)  It is undisputed that the Minnesota Attorney General's Office represented Mr. Heinz, and Mr. Heinz alleges that he relied on the Office, including William Gosiger from the Consumer Division of the Minnesota Attorney General's Office, to "relay. . . any communications and information they received from Carrington regarding [his] account."  (*See* Heinz Aff. ¶ 21; Def's Summ. J. Br. at 28.)

To avoid foreclosure, it is undisputed that Mr. Heinz submitted his first loss mitigation application to Carrington on August 3, 2017. (Ostermann Aff. Ex. F; Compl. ¶ 21.) Five days later, on August 8, 2017, Carrington submitted a letter to Mr. Heinz acknowledging receipt of the application and requesting the following documentation by August 23, 2017 to remain eligible for loss mitigation assistance:

(1) Mr. Heinz's tax returns;

(2) IRS 4506-T Form fully executed by Mr. Heinz;

(3) a request for mortgage assistance ("RMA") completed and executed by Mr. Heinz;

(4) proof of all household income;

(5) monthly living expense worksheet; and

(6) a detailed hardship letter.

(Ostermann Aff. Ex. F.)

Following phone calls between Carrington and Mr. Heinz about the missing documents above, Carrington received additional documents from Mr. Heinz to review, two days before its August 23 deadline. Carrington, however, determined that the application was incomplete because it was missing "([1]) complete income tax returns, [2] a complete RMA, [3] proof of all household income, and [4] a monthly living expense worksheet." (Ostermann Aff. Ex. L at 77.)

Carrington acknowledges receiving additional documents on August 29 and September 1, 2017 from Mr. Heinz, including, among other things, a "profit and loss statement for July 2017 through August 2017" and an application of automatic extension

to file income tax returns for the years 2014 and 2016. (*Id*.) But, Carrington determined the application remained incomplete, as Carrington evidently sought five new categories of documents:

> (1) Mr. Heinz's most recent quarterly or year-to-date profit and loss statement;
>
> (2) Mr. Heinz's paystubs reflecting at least 30 days income with year-to-date earnings;
>
> (3) an explanation of the 2016 tax extension;
>
> (4) the current 2017 social security income award letter; and
>
> (5) two months proof of receipt of Mrs. Heinz's income.

(Ostermann Aff. Ex. L at 77.) On September 2, Carrington sent a letter to Mr. Heinz stating that each of the above-missing documents must be received no later than September 17, 2017 to remain eligible for loss mitigation assistance. (Ostermann Aff. Ex. L at 77-78.)

After a phone call on September 6 about the missing documents, Carrington acknowledged that it received additional documents from Mr. Heinz the next day. (Ostermann Aff. Ex. L at 78.) Notably, among the documents Carrington acknowledges receiving was a "letter of clarification regarding Mr. Heinz's profit and loss statement and an Income Statement from July 1, 2017 through September 6, 2017." (Ostermann Aff. Ex. L at 78; *see also id*., Ex. H at 48.)

The parties dispute whether Carrington received two required categories of documents for Mr. Heinz's first loss mitigation application: (1) a three-month profit and loss statement; and (2) Mr. Heinz's paystubs for thirty consecutive days. (Def.'s Summ.

J. Br. at 7; Pl.'s Br. in Opp. to Summ. J [Doc. No. 29] ("Pl.'s Opp. Br.") at 7-8.) If these two categories of documents had been received, the parties agree that Mr. Heinz's first application would have been considered complete. As to Carrington's request for a three-month profit and loss statement, Mr. Heinz alleges that a statement constituting "the entire small business history for 2017 was included" with his first application. (Heinz Aff., ¶¶ 23-24; Ostermann Aff. Ex. H at 48-49.) He further alleges that the statement covered the period Carrington requested from July 1, 2017 through September 6, 2017. (*Id*.)

As to Carrington's request for paystubs, Mr. Heinz appears to allege the Income Statement that he submitted satisfied this request. (*See* Heinz Aff. ¶¶ 27-28.) The Income Statement lists Mr. Heinz as the only employee for his own start-up company. (Ostermann Aff., Ex. H at 49.) His compensation is listed as $ 6,923 dollars. (*Id*.) Mr. Heinz alleges that he had no paystubs to submit for this amount, because "[n]o checks from the company were written to [him] as traditional paychecks, as such a check would be coming from and going to the same bank account." (Heinz Aff. ¶ 27.) Heartland Business Services, Inc. allegedly never had a "checking account separate from [Mr. Heinz's] personal checking account." (Heinz Aff. ¶ 25.) Nonetheless, Carrington alleges that on September 6, 2017, it determined the application remained incomplete, as it was still missing these two categories of documents. (Ostermann Aff. Ex. L at 78.)

On September 18, 2017, Mr. Heinz contacted Carrington to discuss his loan account and mortgage assistance application. (Ostermann Aff. Ex. L at 78; Heinz

Aff. ¶ 15.)  Carrington alleges that during the call, its representative "advised [Mr. Heinz] of the documents that were still missing at that time."  (Ostermann Aff. Ex. L at 78.)

Nearly two weeks later, on September 29, 2017, it is undisputed that Carrington represented that Mr. Heinz was only missing one category of documents needed for his first mortgage assistance application to be considered complete.  (Ostermann Aff. Ex. L at 78-79.)  In an email to Mr. Gosiger providing a status update on Mr. Heinz's application, Carrington conceded that "all that [Mr. Heinz] needed to provide was a profit and loss statement for the time period of July 1, 2017 through September 6, 2017." (Ostermann Aff. Ex. L at 78-79.)  The parties contest whether Carrington received this document.  Mr. Heinz alleges that the requested profit and loss statement was provided to Carrington "as of at least September 7, 2017, and again by fax on September 18, 2017." (Heinz Aff. ¶ 36; *see also* Ostermann Aff. Ex. H.)  Carrington, on the other hand, alleges that "since the date of [the September 29] email," Mr. Heinz's application "remained incomplete."[2]  (Ostermann Aff. Ex. L at 78-79.)

Approximately a week later, on October 8, 2017, Mr. Heinz's application was cancelled.  (Ostermann Aff. Ex. L at 78.)  On the same day, Carrington mailed a Cancellation Notification to Mr. Heinz informing him that his application for mortgage assistance had been cancelled, because Carrington allegedly did not receive the requested documents within the allotted September 17 deadline.  (*Id.*, Ex. L at 78, 105.)  As

---

[2] Although Defendant argues Mr. Heinz admitted that Carrington advised him that his Income Statement did not satisfy Carrington's request for a three-month profit and loss statement, (*See* Def.'s Summ. J. Br. at 7 n. 28), the cited portion of Mr. Heinz's testimony does not appear in the record before the Court.  (*See* Sathre Aff. Ex. C.)  Thus, the Court does not consider this alleged testimony for this motion.  *See* Fed. R. Civ. P. 56.

explained above, the parties vigorously contest whether Carrington received the documents requested for Mr. Heinz's first loss mitigation application. (*Id.*; Heinz Aff. ¶¶ 28, 32.)

Nonetheless, the parties do not dispute that Mr. Heinz submitted a second request for mortgage assistance to Carrington on October 12, 2017. (Ostermann Aff. Ex. L at 78; Pl.'s Opp. Br. at 22.) Two days later, on October 14, 2017, Carrington sent a letter to Mr. Heinz indicating that the following documentation needed to be submitted by October 29, 2017 to determine Mr. Heinz's eligibility for loss mitigation assistance:

(1) Mr. Heinz's paystubs for thirty consecutive days reflecting year to date earnings;

(2) Mr. Heinz's tax returns;

(3) IRS 4506-T Form fully executed by Mr. Heinz;

(4) personal bank statements reflecting household expenses for the last two months;

(5) a letter attesting to the number of occupants who reside in the Property;

(6) a hardship letter; and

(7) a list of monthly living expenses.

(Ostermann Aff. Ex. L at 110.) Although Carrington concedes that many of the above documents had been submitted before, Carrington alleges new and updated versions of the documents were required "due to the prior documents [] having become aged beyond permissible program timelines." (Ostermann Aff. Ex. L at 79; Def.'s Summ. J. Br. at 8.)

Carrington received additional documents on October 20 from Mr. Heinz, including among others, a bank statement from July 11, 2017 through August 10, 2017.

(Ostermann Aff. Exs. M, R.)  But Carrington determined the application remained incomplete, as the application was missing two categories of documents, and Carrington sought three new categories of documents:

> (1) Mr. Heinz's paystubs for thirty consecutive days reflecting the year-to-date earnings;
>
> (2) IRS 4506-T Form fully executed by Mr. Heinz;
>
> (3) two most recent bank statements (with recurring household expenses circled);
>
> (4) Mrs. Heinz's Social Security Income Award Letter for $ 1,792 dollars; and
>
> (5) proof of receipt of Mrs. Heinz's social security income for two months.

(Ostermann Aff. Ex. M.)  On October 21, Carrington sent a letter to Mr. Heinz stating that each of the above-missing documents must be received no later than November 11, 2017 for Mr. Heinz to remain eligible for loss mitigation assistance.  (*Id.*)

Mr. Heinz contacted Carrington by phone on October 27, 2017 to inquire into the status of his application.  (Ostermann Aff. Ex. R at 145.)  During the call, Carrington alleges that its representative reminded Mr. Heinz of the missing documents and provided Mr. Heinz with Carrington's fax number and email address, encouraging Mr. Heinz to send the missing documents immediately as the foreclosure sale was set for November 14, 2017.  (*Id.*)  Mr. Heinz alleges that "Carrington's agents told [him] the [foreclosure] sale would be stopped if [Mr. Heinz] provided all materials they requested to evaluate [Mr. Heinz's] application for loan modification."  (Heinz Aff. ¶ 45.)

Before the November 11 deadline, Carrington acknowledges that it received additional documents from Mr. Heinz.  (Ostermann Aff. Ex. R.)  On October 27, 2017,

Mr. Heinz sent several documents to Carrington, including copies of bank summaries dated August 10, September 11, and October 10, 2017 with deposits circled. (*Id.*) Carrington alleges that it reviewed these documents three days later, and determined that "the application was still incomplete, as [Carrington] had not received: [1] thirty consecutive days of the borrower's paystubs reflecting the year-to-date earnings; [2] a fully-executed IRS Form 4506-T; nor [3] non-borrower's SSI award letter and [4] proof of receipt for two months." (Ostermann Aff. Ex. R at 145.) The record does not demonstrate that this information was conveyed to Mr. Heinz before the allotted November 11 deadline.

In fact, it is undisputed that, before the November 14 foreclosure sale, Mr. Heinz did not receive a written denial for his second application for mortgage assistance. (Heinz Aff. ¶ 48; Ostermann Aff. Ex. R at 145.) To the contrary, Mr. Heinz alleges that Carrington made representations that his application was complete. (Heinz Aff. ¶ 41; *see also* Heinz Aff. Ex. A.) In a letter dated six days before the pending November 14 foreclosure, Mr. Gosiger informed Mr. Heinz that "[o]n November 7, 2017, Ms. Raish from Carrington. . . confirmed [Mr. Heinz's] file had been sent to underwriting and is awaiting a decision." (Heinz Aff. Ex. A.) Mr. Heinz subsequently received a voicemail from Mr. Gosiger on November 14, 2017, explaining the meaning of a loan modification application sent to "underwriting." (Heinz Aff. Ex. B.) In the voicemail, Mr. Gosiger explained that when an application is sent to "underwriting," the foreclosure sale is postponed because the application is considered "complete":

> . . . ***It's important when a mortgage request for assistance
> packet goes into underwriting, because it means the packet
> is complete***.  Now that does not necessarily mean that the
> underwriters aren't going to ask for more information, but it
> does mean that at that point, ***they have to postpone any
> sheriff's sales that have been scheduled***. And that's very
> important.  If the underwriters come back and say that. . . that
> they are confused about this or that, that is fine.  Generally,
> that is not the case; generally, when it [has] gone through the
> review before underwriting, it is pretty much done. It's not a
> lock… it's not a lock, though. But it does mean that the
> packet was complete.  So that's very important in our
> process."

(Heinz Aff. ¶ 43; Ex. B) (emphasis added).  Carrington, however, still determined that

Mr. Heinz's second application was incomplete.  (Ostermann Aff. Ex. R.)  It did not

postpone the foreclosure sale.

### 4.     The Foreclosure and Mr. Heinz's Attempts to Rescind the Sale

As scheduled, Carrington continued with the foreclosure action on November 14,

2017.  At the sale, BANA bought the Property for the sum of $ 225,120 dollars.

(Ostermann Aff. Ex. O at 123.)  The sale was subject to a six-month redemption period,

meaning the deadline for Mr. Heinz to redeem the Property was May 14, 2017.  (*Id.*)

Two days after the foreclosure sale, on November 16, 2017, Carrington mailed a

cancellation notice to Mr. Heinz advising him, for the first time, that his second loss

mitigation application was cancelled.  (Ostermann Aff. Ex. N; Heinz Aff. ¶ 48.)  The

cancellation notice also advised Mr. Heinz that the application would no longer be

considered.  (Ostermann Aff. Ex. N.)

To seek a rescission of the foreclosure during the redemption period, Mr. Heinz alleges that he "continued to work with Carrington" through the Minnesota Attorney General's Office.  (Heinz Aff. ¶ 49.)  Mr. Heinz testified that at no time did he pursue or secure other financing that would have allowed him to pay the redemption amount.  (Sathre Aff. Ex. C at pp. 57-58.)  On or about April 2, 2018, Mr. Gosiger requested that Carrington rescind the foreclosure sale.  (Heinz Aff. ¶ 49.)  Carrington promised it would respond to this request "on or before April 20, 2018."  (Heinz Aff. Ex. C.)  On April 20, Carrington informed Mr. Gosiger that it "is still researching [Mr. Heinz's] loan" and Carrington anticipated now "completing [its] investigation by no later than May 4, 2018", at least ten days before the redemption period expired.  (Heinz Aff. Ex. D.)  It is undisputed that neither Mr. Heinz nor the Minnesota Attorney General's Office received any update before the expiration of the redemption period.

In a letter dated May 15, 2018—one day after the redemption period expired—Carrington responded to Mr. Gosiger's rescission request.  (Ostermann Aff. Ex. R.)[3]  Carrington declined to rescind the November 14 sale.  (*Id*.)  The request was denied because Carrington alleges documentation for Mr. Heinz's mortgage assistance application was never received:

> . . . [Carrington] counseled the borrower on providing the information, and providing multiple avenues to deliver the information to expedite processing.  [Carrington] also clearly disclosed the impending foreclosure sale date, as well as the consequences in the event the necessary information was not provided.  ***Despite [Carrington's] best efforts, the borrower***

---

[3] The cover email attaching Carrington's May 15 letter reveals that Carrington sent a copy of the letter directly to Mr. Heinz.  (Heinz Aff. Ex. R.)

> *persistently failed to deliver the information.* For these
> reasons, [Carrington] respectfully declines to rescind the
> November 24,2017 sheriff's sale.

(*Id.* at 146.) (emphasis added). The May 15 letter also represented that the Property had

been sold to a third-party bidder at the sheriff's sale on November 14, 2017. (*Id.* at 145.)

Both parties agree that the Property was in fact sold to BANA, not a third party, at the

foreclosure sale. (Heinz Aff. ¶¶ 53-54; Ostermann Aff. Ex. O.) On February 1, 2018,

BANA sold the property to Raimis Construction, LLC ("Raimis"). (Ostermann Aff. Ex.

P.)

### B.    Procedural Background

On June 8, 2018, Mr. Heinz filed this lawsuit in Minnesota state court against

Carrington and Renovo Properties LLC ("Renovo"), who subsequently acquired the

Property from Raimis, seeking rescission of the foreclosure sale and damages. (*See*

Compl. [Doc. No. 1-1].) Mr. Heinz also moved for a temporary restraining order

enjoining a pending eviction action, which was denied as unnecessary relief to prevent

irreparable harm and unlikely to succeed ultimately on the merits. (Sathre Aff. Ex. D.)

On July 9, 2018, Carrington removed Mr. Heinz's suit to federal court. (*See*

Notice of Removal [Doc. No. 1].) Carrington did this because Mr. Heinz based his

action, in part, under the laws of the United States, namely the Fair Debt Collection

Practices Act, 15 U.S.C. § 1692 (the "FDCPA"). *See* 28 U.S.C. § 1441 (allowing

defendant to remove civil actions brought in a State court on the basis of federal question

jurisdiction); 28 U.S.C. § 1367(a) (allowing the court to exercise supplemental

jurisdiction over claims arising under Minnesota state law if the claims are so related to

the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.)

In his complaint, Mr. Heinz alleged violations of the FDCPA and two other claims arising under Minnesota state law. (Compl. ¶¶ 31-57.) The two state law claims Mr. Heinz alleged were: (1) dual-tracking in violation of Minn. Stat. §§ 580.02 and 580.043; and (2) inadequate service of foreclosure advice notices under Minn. Stat. § 580.041. (*Id.*) However, in a joint stipulation filed shortly before Carrington moved for summary judgment, Mr. Heinz voluntarily dismissed all claims against Renovo. [Doc. No. 17.] Moreover, based on the parties' summary judgment briefing and the June 14, 2019 oral argument, it appears that Mr. Heinz is now only pursuing one claim: the FDCPA claim under 15 U.S.C. § 1692. (*See* Def.'s Summ. J. Br.; Pl.'s Opp. Br. at 13; Def.'s Reply Br. [Doc. No. 31] ("Def.'s Reply Br.").)

## II.     DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, and the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, a party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, and must set forth specific facts in the record showing that there is a genuine issue

for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016).

### A.    FDCPA Claim

Mr. Heinz's only surviving claim arises under the FDCPA. *See* U.S.C § 1692. Mr. Heinz alleges that Carrington violated U.S.C. §§ 1692(e) and (f) by falsely assuring Mr. Heinz and the Minnesota Attorney General's Office that the sheriff's sale would be postponed and by foreclosing on the Property in violation of Minnesota's dual-tracking statute.   (Pl.'s Opp. Br. at 13; Compl. ¶¶ 58-66.)   In challenging Carrington's communications and conduct under the FDCPA, Mr. Heinz's claim spans communications pre- and post- the foreclosure sale date.  Mr. Heinz alleges that, before the November 14 foreclosure sale, Carrington misled him and the Minnesota Attorney General's Office by falsely claiming that: (i) the loan modification was under review and sent to "underwriting"; and (ii) all documentation for the first loss mitigation application was not received.  (Compl. ¶ 64; Pl.'s Opp. Br. at 2-5.)

Mr. Heinz alleges that, after the November 14 foreclosure sale, Carrington continued to mislead Mr. Heinz and the Minnesota Attorney General's Office by (i)"stringing out the process of correspondence" during the redemption period when "Carrington had already transferred its interest in the [Property] by February 2018"; (ii) falsely claiming that Mr. Heinz "persistently failed to deliver" the requested information for his mortgage assistance applications; and (iii) falsely claiming the Property was sold

at the foreclosure sale to a third-party bidder, when it was sold to BANA. (Compl. ¶¶ 64-65; Pl.'s Opp. Br. at 2-5.)[4]

### 1. The Law

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). In furtherance of this purpose, the FDCPA requires and prohibits certain activities by debt collectors that are done "in connection with the collection of any debt." *See id.* §§ 1692(c) (prohibiting certain communications), 1692(d) (prohibiting harassment or abuse), 1692(e) (prohibiting false or misleading representations), 1692(f) (prohibiting unfair practices), 1692(g) (requiring validation of debts).

The parties here agree that the promissory note constitutes a debt, and Carrington does not dispute that it is a "debt collector" under the FDCPA. *See Gray v. Four Oak Court Ass'n, Inc.,* 580 F.Supp.2d 883, 887-888 (D.Minn. 2008); (Def.'s Reply Br. at 5-6.) For this motion then, the relevant question is whether a reasonable jury could conclude from the record that Carrington's communications and conduct related to the "collection of a debt" as the FDCPA requires. *Gray,* 580 F.Supp. 2d 883 at 888.

---

[4] Some challenged communications were asserted to have been made by Carrington directly to the Minnesota Attorney General's Office, not Mr. Heinz. (*See* Pl.'s Opp. Br. at 2-5.) Carrington argues the Court should disregard these claims as third-party statements. (Def.'s Summ. J. Br. at 31.) For this motion, the Court considers all of the challenged communications and conduct. (Pl.'s Opp. Br. at 2-5.)

The FDCPA does not define when a communication is made "in connection with the collection of any debt." That said, the Eighth Circuit has adopted an "'animating purpose' test to interpret this phase, holding the test provides that "for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor." *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) (internal quotation mark omitted) (adopting test articulated by other circuits). A communication that explicitly demands payment of a debt generally meets the "animating purpose" test, but an explicit demand is not required. *Id.* Implicit demands for payment are sufficient based on the context in which the communication was made. *Randall v. Paul,* 897 N.W.2d 842, 849 (Minn. Ct. App. 2017) (citing *Caceres v. McCalla* Raymer, LLC, 755 F.3d 1299, 1303 & n.2 (11th Cir. 2014)).

For statements or conduct in connection with foreclosure activities, courts in this Circuit have generally found these statements to not relate to debt collection activities. *See Bredlow v. CitiMortgage, Inc.,* No. 15–3087, 2016 WL 310728, *4 (D. Minn. Jan. 26, 2016) (holding that conduct and statements made in connection with foreclosure of a mortgage are not in connection with collection of the underlying debt under the FDCPA); *Gray,* 580 F. Supp. 2d 883 at 888 (finding activities incident to enforcement of a security interest, such as lien foreclosure activities, not to constitute "debt collection" under the FDCPA); *Owens v. Hellmuth & Johnson, PLLC,* 550 F. Supp. 2d 1060, 1066 (D. Minn. 2008) (distinguishing activities concerning security interest from activities concerning underlying debt); *Siegel v. Deutsche Bank Nat'l Trust Co*., No 08–517, 2009 WL

3254491, *4 (D. Neb. Oct. 8, 2009) ("A mortgage foreclosure is not a debt collection activity.") (citation omitted)).

The Eighth Circuit has not addressed the FDCPA in the specific context of statements or conduct relating to loss mitigation applications. Nonetheless, whether this communication has the requisite connection with a debt collection activity is an objective, "common sense inquiry", and is generally a fact question reserved for a fact finder. *See Randall*, 897 N.W.2d at 849 (citing *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385-86 (7th Cir. 2010)). Summary judgment may be appropriate, however, if based on the undisputed facts and viewing the evidence in the light most favorable to the nonmoving party, a reasonable fact-finder could only find in favor of one party. *See Grden v. Leikin Ingber & Witners PC*, 643 F.3d 169, 173 (6th Cir. 2011) (affirming summary judgment for defendant because "a reasonable jury could not find that an animating purpose of the statements was to induce payment").

## 2. Analysis

Mr. Heinz's FDCPA claim fails for two reasons. First, Mr. Heinz has not pointed to any case law in the Eighth Circuit that suggests that statements about mortgage foreclosures or loss mitigation applications relate to the "collection of a debt." Although Mr. Heinz urges that the challenged statements here are actionable under the FDCPA, the cases in support of Mr. Heinz's position are either from other jurisdictions, or do not apply to the threshold issue here. (Pl. Br. at 14-15.)

For instance, Mr. Heinz relies on *Friend v. Fryberger, Buchanan, Smith & Frederick*, P.A., No. 11–1584, 2012 WL 503796 (D. Minn. Feb. 14, 2012), in which the

issue the Court decided was whether a law firm qualified as a "debt collector" under the FDCPA. (*See* Pl.'s Opp. Br. at 14-15.) Dismissing the FDCPA claim on other grounds, the Court determined that the firm qualified as a "debt collector", but noted the explicit need "not to decide" whether any "foreclosure-related communications" supported liability under the FDCPA. *Id.* at *6 (recognizing "split of authority" when comparing courts in the Eighth Circuit to other circuit court decisions on whether communications relating to foreclosure actions constitute debt-collection activities under the FDCPA). The Court in *Friend* therefore did not reach the issue before us now, which is whether the challenged communications and conduct here is subject to the FDCPA.

The courts in this Circuit reaching this threshold issue rely on the text and legislative history of the FDCPA. *See, e.g.*, *Gray,* 580 F. Supp. 2d at 888 (interpreting the term "debt collector" in the FDCPA as "reflect[ing] Congress's intent to distinguish between 'the collection of any debts' and 'the enforcement of security interests'"); *Owens*, 550 F. Supp. 2d at 1066 (interpreting the reading of the word "enforcement" of a security interest in the FDCPA)*; Bredlow*, 2016 WL 310728 at *4 (relying on *Gray* and *Owens*). The nuances of these holdings appear to have been overlooked by both parties here.

Both parties argue for a categorical approach to foreclosure-related communications under the statute. (*Compare* Pl.'s Opp. Br. at 15 *with* Def's Summ. J. Br. at 29.) Citing other circuit court decisions, Mr. Heinz appears to assert that communications concerning mortgage foreclosures are, as a matter of law, in connection with the collection of an underlying debt and thus subject to the FDCPA, (Pl.'s Opp. Br.

at 15), while Carrington asserts that, as a matter of law, communications in connection with the foreclosure of a mortgage cannot be made in connection with a "debt collection." (Def's Summ. J. Br. at 29.) As to Mr. Heinz's interpretation of the FDCPA, the courts in this Circuit reject this approach, and instead carefully probe each foreclosure-related communication to determine whether the communication concerns: (1) an underlying debt, or (2) an "enforcement" of a security interest—which is outside the scope of the FDCPA. *See, e.g.*, *Owens*, 550 F. Supp. 2d at 1066. And as to Carrington's interpretation, this Court in *Owens* chose not to adopt Carrington's broad reading of the statute because it would render "any step in the process of collecting a secured debt, even when unaccompanied by efforts to dispossess the debtor of the property secured by the debt. . . beyond the statute's ambit." *Owens*, 550 F. Supp. 2d at 1066 (holding a dunning letter demanding payment for delinquent homeowner-association dues violated the FDCPA). The Court agrees with *Owens* and its progeny, and carefully applies the same principles here to the facts of the instant case.

Second, when viewing the facts in the light most favorable to Mr. Heinz and applying the principles above, there is no evidence from which a reasonable juror could conclude that Carrington's communications and conduct were in connection with the "collection of a debt" as the FDCPA requires. Mr. Heinz alleges that, before the November 14 foreclosure sale, Carrington's communications and conduct sought to induce payment from Mr. Heinz because, as a "debt collector", Carrington was "haggling over repayment terms" with a "defaulted debtor." (*See* Pl.'s Opp. Br. at 16-17.)

There is no support in the record for Mr. Heinz's assertion. The Court finds that none of Carrington's alleged misrepresentations relate to specific repayment terms. Rather, the record confirms that before the November 14 foreclosure sale, the challenged communications concern whether missing documents were received, and whether Mr. Heinz's loan modification application was complete and sent to "underwriting." (Pl.'s Opp. Br. at 18-19.) Unlike *Owens*, the challenged communications do not discuss the terms of the underlying debt, demand payment for the debt evidenced by the note or in any other form, or threaten additional collection proceedings. (*See* Pl.'s Opp. Br. at 2-5; Ostermann Aff. Exs. L, R; Heinz Aff. Exs. A-B.) Instead, Carrington was actively engaged in a process to dispossess Mr. Heinz of the Property. Indeed, the challenged communications threatened foreclosure if Carrington did not receive the necessary documentation. *See, e.g*., Ostermann Aff. Exs. F; L at 77,110; M (referring to Carrington's right of foreclosure unless all required documentation is received.) Such actions can only be fairly regarded as "enforcement" of security interests pending the foreclosure sale of the Property. *Owens*, 550 F. Supp. 2d at 1066. Thus, the "animating purpose" of these communications and conduct cannot be appropriately described as seeking to collect the underlying debt. The Court therefore determines that the lien-foreclosure activities here do not constitute debt collection under the FDCPA.

Moreover, to the extent that the loss mitigation-related communications before the November 14 foreclosure sale can be distinguished from those directly incident to lien enforcement, such communications do not separately support liability under the FDCPA. As explained above, the record shows that these communications did not threaten any

additional collection proceedings or demand payment in any form. The "animating purpose" of these communications and conduct cannot therefore be appropriately described as attempting to collect the underlying debt. Thus, Mr. Heinz fails to state a claim for relief for these specific communications under the FDCPA. [5]

Similarly, the record shows that, after the November 14 foreclosure sale, Carrington did not seek payment from Mr. Heinz. As to Mr. Heinz's claim that Carrington used "unfair and unconscionable means" after the foreclosure sale because it "str[ung] out the process of correspondence when Carrington had already transferred its interest in the [Property] by February 2018," the record fails to demonstrate why these activities were aiming to collect a debt. In fact, the record shows that the challenged activities were incidental to the potential rescission of Carrington's "enforcement" of a security interest. (Ostermann Aff. Ex. R.) And although the Court acknowledges that the timing of Carrington's response could be appropriately described as unfair, Mr. Heinz fails to explain why he could not have timely (i) filed a notice of *lis pendens*, (ii) pursued a Minn. Stat. § 582.043 claim, or (iii) redeemed the Property otherwise. (Def.'s Reply

_____

[5] While not dispositive, instructive to this Court's analysis is a Consumer Financial Protection Bureau ("CFPB") advisory opinion on the interplay between the FDCPA and two federal statutes when a consumer is in default of a mortgage loan. Implementation Guidance for Certain Mortgage Servicing Rules, 10152013 CFPBGUIDANCE, 2013 WL 9001249 (C.F.P.B. Oct. 15, 2013). In relevant part, the CFPB advises that a debt collector is not liable under the FDCPA for sending communications to a consumer in compliance with loss mitigation procedures pursuant to 12 C.F.R. § 102.41, even when a consumer requests that the debt collector cease further communication. The CFPB's guidance appears to be applicable here, when there is no indication that Mr. Heinz sent a cease communication notice when he was in default on his mortgage loan, and Carrington was responding to the loss mitigation application, as required, prior to the foreclosure of the Property. *See* 12 C.F.R § 1024.41.

Br. at 12.)  That Carrington failed to respond to the request for rescission during the redemption period, while falling short of consumer expectations, does not negate Carrington's cancellation notice expressly advising Mr. Heinz that his mortgage assistance application would no longer be considered after the foreclosure.  (Ostermann Aff. ¶ 23; Ex. N.)  Thus, the Court agrees with Carrington that the record fails to demonstrate how Carrington's activities after the foreclosure had a material effect on Mr. Heinz's potential courses of action, or the outcome of the debt collection process.

Finally, Mr. Heinz's allegation that Carrington misrepresented that the Property was sold to a third party at the foreclosure sale, when it was sold to BANA, is immaterial and fails as a matter of law.  *Hill v. Accounts Receivable Services, LLC*, 888 F. 3d 343, 346 (8th Cir. 2018) ("A statement cannot mislead unless it is material, so a false but non-material statement is not actionable").  The record confirms that Carrington made this representation after the redemption period expired.  (Ostermann Aff. Ex. R.)  The Court agrees with Carrington that it is unclear how this representation could have affected Mr. Heinz's legal rights or reasonably induced him to take or refrain from taking action to his detriment.  (Def.'s Reply Br. at 12); *see also Grunwald v. Midland Funding, LLC*, 172 F. Supp. 3d 1050, 1053 (D. Minn. 2016).  Nor does Mr. Heinz assert that Carrington's informational response strove to collect any underlying debt.

For these reasons, the Court grants Defendant's summary judgment motion on the FDCPA claim.  In light of this determination, the Court need not address Defendant's remaining contentions seeking dismissal of Plaintiff's FDCPA claim.  (*See* Def.'s Summ. J. Br. at 31.)

## III.    CONCLUSION

The Court acknowledges that Mr. Heinz fully cooperated with Carrington to try to stop it from foreclosing on the Property.  As such, Carrington's actions during the foreclosure process, when accepting all of Mr. Heinz's allegations as true, might appropriately be described as unfair.  However, as the Court emphasized above, the relevant question for purposes of this motion is whether a reasonable juror could conclude, from this record, that Carrington's communications and conduct were in connection with the "collection of a debt" as required by the FDCPA.  Consequently, because the record does not suggest that Carrington sought to collect the underlying debt evidenced by the note here, the law requires the Court to find in Carrington's favor.

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Carrington Mortgage Services, LLC's Motion for Summary Judgment [Doc. No. 21] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  November 19, 2019                         s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge